**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Case No. 1:21-cr-00311-CRC-1** |
| | * | |
| **JEREMY GROSECLOSE,** | * | |
| **Defendant** | * | |
| | * | |

## MOTION TO DISMISS COUNT ONE

Mr. Groseclose, by his undersigned counsel, hereby moves pursuant to FED. R. CRIM. PROC. 12(b) to dismiss Count Two of the Superseding Indictment, which charges him with committing and attempting to commit an "act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder" in violation of 18 U.S.C. § 231(a)(3).

## I.    Legal Standard

A defendant may move to dismiss specific counts of an Indictment on the basis that there is a "defect in the indictment or information" including a "failure to state an offense." Fed. R. Crim P. 12(b)(3)(B)(v). "The operative question is whether the allegations, if proven, would be sufficient to permit a jury to" conclude that the defendant committed the criminal offense as charged. *United States v. Sanford, Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012); *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D. D. C. 2011).

II.     **Section 231(a)(3)'s structure and legislative history**

Section 231(a)(3) provides a 5-year term of imprisonment for:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—

Section 231(a)(3) was enacted as part of the Civil Obedience Act of 1968 (COA). Pub. L. 90-284, Apr. 11, 1968, Title X. Senator Russell B. Long of Louisiana sponsored the COA during the Senate's debates over the Civil Rights Act of 1968. 114 Cong. Rec. 1294-96 (Jan. 29, 1968). It was proposed as a rejoinder to the civil rights bill and to the civil rights movement. Long explained the purposes of the COA in floor debate:

First, the COA was to nullify the legal protections proposed under the "hate crime" title of the Civil Rights Act of 1968.  Codified at 18 U.S.C. § 245, that title criminalized interfering with another person because of the person's race or because he engaged in federally protected activity. Senator Long was clear that the COA was designed to diminish the hate crime law. 114 Cong. Rec. 1287-94 (Jan. 29, 1968).  His "greatest immediate concern" about the hate crime law was "the unwitting stumbling block it could place before State and local officials in their honest attempts to detain and prosecute incendiary rabble rousers." *Id.* at 1289.  He noted that "half of the Baton Rouge police force could have been thrown into jail" under the hate crime law for beating and setting attack dogs on peaceful protestors. *Id.*

Second, it was the COA's purpose to jail civil rights leaders. For example, Senator Long said the COA was needed due to "a so-called civil rights march led by Dr. Martin Luther King in the

streets of Birmingham in March of 1963." 114 Cong. Rec. 1294 (Jan. 29, 1968). During that march, Long complained, Dr. King had "addressed a tense crowd with inflammatory words," while in jail, King "wrote an inflammatory letter which gained wide recognition in its pleas for Negroes to disobey those laws they felt unjust." *Id.* Long offered similar explanations for the COA by reference to other civil rights leaders. 114 Cong. Rec. 5536 (Mar. 6, 1968). As for the constitutional power Congresses needed to pass the COA – the Commerce Clause – Long explained the COA would apply to intrastate conduct so that it would "not leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." 114 Cong. Rec. 5533. Third, Senator Long said the COA would "strike at" the "doctrine . . . that one should not obey the laws that stand in the way of alleged 'civil rights.'" 114 Cong. Rec. 1295 (Jan. 29, 1968). As to the COA section that would become § 231(a)(3), Senator Long explained that this section "would make it a Federal offense for people to snipe at firemen or shoot at policemen while they are trying to do their duty protecting lives and property." 114 Cong. Rec. 5542.

## III.   The Government Does Not Allege a "Federally Protected Function"

To establish that Mr. Groseclose is guilty of a Section 231(a)(3) offense, the government must allege and prove beyond a reasonable doubt that the "civil disorder" on January 6 had an adverse effect on a "federally protected function," § 231(a)(3). None of the federal entities involved on January 6 is a "federally protected function." Even if one were, it was not properly presented to the grand jury.

"Federally protected function" is defined as any "function, operation or action carried out . . . by any *department, agency, or instrumentality of the United States* or by an officer or employee thereof." 18 U.S.C. § 232(3) (emphasis added).

For purposes of Title 18, "department" and "agency" are defined as follows:

> The term "department" means one of the executive departments enumerated in section 1 of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government.

> The term "agency" includes any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more limited sense.

18 U.S.C. § 6.

The Supreme Court has held that Section 6's definition of "department" as "one of the *executive* departments enumerated in section 1 of Title 5" presumptively controls any Title 18 statute's use of that term unless the government makes a "fairly powerful" "showing" that Congress intended, in the statute at issue, that "department" should refer to the "legislative, or judicial branches of government," which the Court held was the "unusual sense" of the term. *Hubbard v. United States*, 514 U.S. 695, 700 (1995). In *Hubbard*, a man was convicted under a now-superseded version of § 1001 that punished "'Whoever, in any matter within the jurisdiction of *any department or agency of the United States* knowingly and willfully . . . makes any false, fictitious or fraudulent statements. . .'" 514 U.S. at 698 (quoting § 1001) (emphasis added). The man had filed false records in a bankruptcy court. The lower courts upheld his conviction on the ground that such a court was a "department . . .of the United States," in the sense that the executive, legislative and judicial branches of government were sometimes referred to as "departments" in the 18th century. *Id.* Not only did the Supreme Court reverse his conviction on the ground that this interpretation of "department" was inconsistent with § 6, it overruled its own prior contrary precedent notwithstanding the gauntlet of

4

*stare decisis.* 514 U.S. at 701.

Applying the *Hubbard* rule, the D.C. Circuit has held that congressional entities do not satisfy Section 6's "department" and "agency" "of the United States" because they are not *executive* departments and agencies. *See United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (after Supreme Court's decision in *Hubbard*, "an *entity within the Legislative Branch* cannot be a 'department' within the meaning of § 1001 and 18 U.S.C. § 6," nor is Congress an "agency" under § 6) (emphasis added); *United States v. Dean*, 55 F.3d 640, 659 (D.C. Cir. 1995) (reversing convictions under § 1001 for false statements to Congress, as *Hubbard* "narrowed the reach of ["department" and "agency"] *to matters within the executive branch*") (emphasis added). *See also Trump v. Deutsche Bank AG*, 943 F.3d 627, 645 (2d Cir. 2019) (applying *Hubbard* and § 6 and holding that the Right to Financial Privacy Act's reference to a "department or agency" does not apply to Congress) *rev'd and remanded on other grounds sub. nom. Trump v. Mazars USA LLP*, 140 S. Ct. 2019 (2020); *United States v. Perraud*, 672 F. Supp. 2d 1328, 1344 n. 4 (S.D. Fla. 2009) (Congress neither a "department" nor an "agency").

Beyond those decisions, Title 18 distinguishes between congressional entities, on the one hand, and "departments" or "agencies" "of the United States," on the other. Consistent with *Hubbard-Oakar-Dean*, the latter always lie "within the executive branch." *See, e.g.*, 18 U.S.C. § 1505 (distinguishing between obstruction of congressional proceedings and "proceeding[s] . . . before any department or agency of the United States. . .").

The "civil disorder's" "adverse effect" on a "federally protected function" is an element of the § 231(a)(3) charge. That means the government was required to establish probable cause of a "federally protected function" to the grand jury to satisfy the Fifth Amendment's presentment

requirement. U.S. Const. amend. V; *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) (holding that under the Fifth Amendment, "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt").

The list of cases that include a § 231(a)(3) charge listed on the DOJ's January 6 website states that the "federally protected function" was this: the joint session of Congress. Capitol Breach Cases, DOJ, available at: https://www.justice.gov/usao-dc/capitol-breach-cases.   *Hubbard-Oakar-Dean* show that Congress is not a "department" or "agency" "of the United States." To the extent the government claims that any other entity was presented to the grand jury as a "federally protected function," it should produce that evidence to the Court for review *in camera*. Because Congress is not an executive department or agency, the government has not alleged, and did not present to the grand jury, a "federally protected function" that was "adversely affected" by the "civil disorder." Accordingly, the Section 231(a)(3) offense must be dismissed for failure to state an offense and for a grand jury error.

## IV.   Section 231(a)(3) Exceeds Congress' Commerce Clause Authority

The Commerce Clause prohibits the criminalization of noneconomic intrastate activity unless "the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995).  Under that test, the Supreme Court has invalidated federal criminal laws prohibiting gun possession in a school zone and domestic violence in the Violence against Women Act. *Lopez*, 514 U.S. at 552-64; *United States v. Morrison*, 529 U.S. 598, 607-19 (2000).  Following *Lopez* and *Morrison*, § 231(a)(3) constitutes an unconstitutional exercise of Congress's power, intruding into the State's constitutionally protected police power, because it regulates strictly local conduct and

demonstrates no substantial connection to interstate commerce.

**A.    Congress Cannot Regulate Intrastate Activity That Does Not "Substantially Affect" Interstate Commerce**

"Under our federal system, the States possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n. 3 (internal quotation marks omitted). Accordingly, the Supreme Court in *Lopez* concluded that, in the criminal context, Congress's "power . . . [t]o regulate Commerce with foreign Nations, and among the several States[,]" under Article I, § 8, cl.3, is inherently limited by the Tenth Amendment's reservation of police power to the States. The limited federal commerce power permits Congress to regulate only three categories of activity:(1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and (3) "those activities that *substantially* affect interstate commerce." *Id.* (emphasis added).

The Supreme Court developed the third *Lopez* category in order to define "the outer limits" on Congress's authority to enact legislation "regulating intrastate economic activity" that "substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 559; *see also United States v. Robertson*, 514 U.S. 669, 671 (1995) ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects") (emphasis in original). The regulated activity must "substantially affect" interstate commerce because "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618.

7

In *Morrison*, the Supreme Court established a "controlling four-factor test for determining whether a regulated activity 'substantially affects' interstate commerce." *United States v. Adams*, 343 F.3d 1024, 1028 (9th Cir. 2003) (quoting *United States v. McCoy*, 323 F.3d 1114, 1119 (9th Cir. 2003)). Those factors are:

> (1) whether the regulated activity is commercial/economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

*Adams*, 343 F.3d at 1028 (citing *Morrison*, 529 U.S. at 610-612). "The 'most important' factors for a court to consider are the first and the fourth." *Id.*

### 1.      Section 231(a)(3) Does Not Substantially Affect Interstate Commerce

Section 231(a)(3) criminalizes "any act" that obstructs, impedes, or interferes with a local police officer performing lawful duties "incident to and during the commission of a civil disorder which *in any way or degree* obstructs, delays, or adversely affects commerce of the movement of any article or commodity in commerce. . ." (emphasis added). As § 231(a)(3) is not directed at the channels or instrumentalities of commerce, only the third *Lopez* factor is at issue. However, under the four controlling factors described in *Adams* and *Morrison*, § 231(a)(3) does not regulate activity that substantially affects interstate commerce. Accordingly, the statute is unconstitutional.

### 2.      Section 231(a)(3) Does Not Regulate Economic Activity

As in *Lopez* and *Morrison*, the act of interfering with the duties of a law enforcement officer in a civil disorder is not economic in nature. It therefore fails the first *Morrison* factor.

In *Lopez*, the Court found the activity of gun possession under the Gun-Free School Zones

8

Act has "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 567. Further, the Gun-Free School Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.*

Similarly, in *Morrison*, the Supreme Court concluded that the civil remedy for gender-motivated violence under Violence Against Women Act was a regulation of noneconomic activity that exceeded Congress's commerce authority.  529 U.S. at 617.  Even though the VAWA was enacted with the support of significant congressional findings regarding the "nationwide, aggregated impact" of gender-motivated violence on interstate commerce, the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. The "noneconomic, criminal nature of the conduct at issue was central" to the *Lopez* and *Morrison* rulings. *Morrison*, 529 U.S. at 610.

In contrast to *Lopez* and *Morrison*, in *Gonzales v. Raich*, the Supreme Court upheld a federal law prohibiting the intrastate cultivation of marijuana for personal use because the law formed an "essential part" of the Controlled Substances Act (CSA), which encompassed "a larger regulation of economic activity." 545 U.S. 1, 24-25 (2005) (quoting *Lopez*, 514 U.S. at 561). The majority observed that the "primary purpose" of the CSA is "to control the supply and demand of controlled substances in both lawful and unlawful drug markets." *Raich*, 545 U.S. at 19.  Understood within that larger framework, the challenged provision was a regulation on "economic activity" because "failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Id.* at 22.

As with the statutes under consideration in *Lopez* and *Morrison*, the activity regulated by §231(a)(3) is noneconomic for purposes of the first *Morrison* factor. The gravamen of § 231(a)(3) criminalizes obstruction, interference, and impeding state officers, with no direct connection to commerce or economic activity.  And, unlike in *Raich*, § 231(a)(3) is not part of any larger body of economic regulation; it involves "a brief, single-subject statute[,]" which "by its terms has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms." *Raich*, 545 U.S. at 23-24 (distinguishing *Lopez*, 514 U.S. at 561) (internal quotation marks omitted); *accord Morrison*, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity").

**B.      The Jurisdictional Element of § 231(a)(3) Does Not Limit its Reach to Activities That Substantially Affect Interstate Commerce**

Although § 231(a)(3) contains a commercial nexus element, the element is faulty because it does not limit the reach of the statute to activities that "substantially affect" interstate commerce. There are several problems under the second *Morrison* factor on limitations to the statute's reach.

First, the commercial nexus element is not connected to the "any act" element. Section 231(a)(3) makes it a crime to:

> commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce.*

(Emphasis added).  The commercial nexus clause unambiguously modifies the term "civil disorder," not "any act."  Thus, a charge under § 231(a)(3) need not be supported by evidence that a defendant's *act* impacted interstate commerce.  Instead, it requires evidence only that the act

interfered with an officer engaged in the performance of duties "incident to and during the commission of a civil disorder," and that the civil disorder, not the individual's act, minimally affected commerce.

The statutory "incident to and during" connector further diminishes any required link to interstate commerce. Although the statute does not make clear whether the connector applies to the act itself or to the lawful performance of official duties, either construction places the interstate commerce element another step removed from the regulated activity. The term "incident" as an adjective connotes a degree of separation, in that one occurrence of lesser importance is "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." INCIDENT, BLACK'S LAW DICTIONARY (11th ed. 2019). Activity with only an incidental connection to an event that affects commerce is not a permissible subject of federal criminal law.

Finally, the commercial nexus element of § 231(a)(3) does not require a *substantial* effect on interstate commerce, but instead requires a civil disorder that affects commerce "in any way or degree." The terms are virtual opposites. Substantial means "[c]onsiderable in extent, amount, or value," whereas the word "any" is expansive and unqualified. *Compare* SUBSTANTIAL, BLACK'S LAW DICTIONARY (11th ed. 2019) *with* ANY, BLACK'S LAW DICTIONARY (11th ed. 2019); *see St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 550 (1978) (statutory language that covered "'any' act" was "broad and unqualified"). An "any way or degree" impact on commerce is not a "substantial" impact. The second *Morrison* factor is not satisfied.

11

### C.     Congress Did Not Find That § 231(a)(3)'s Activities Substantially Affect Interstate Commerce

Formal Congressional findings are neither required nor sufficient to establish a valid exercise of federal commerce authority. *Lopez*, 514 U.S. at 562-63; *Morrison*, 529 U.S. at 614. Congressional findings may demonstrate that an activity "substantially affects interstate commerce, even though no such substantial effect [is] visible to the naked eye." *Lopez*, 514 U.S. at 563. But "the existence of congressional findings is not sufficient" when Congress merely offers a "but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce." *Morrison*, 529 U.S. at 615.

Here, Congress made no findings to establish that the activity regulated by § 231(a)(3) substantially affects interstate commerce beyond any impact "visible to the naked eye." The only potentially relevant findings relate to the impact of "riots" on interstate commerce. 114 Cong. Rec. 1294-95 (Jan. 29, 1968). Upon first proposing the Civil Obedience Act, Senator Long stated certain facts, without citation, concerning what he called the "wholesale Negro violence," which he said "was an almost nightly affair in the streets of our cities" between 1965 and 1967. 114 Cong. Rec. 1295.

For example, he said:

> In [1967], nearly 100 people were killed. Nearly 2,000 were injured. Police reported 4,289 cases of arson alone. Over 16,000 rioters were arrested. The estimated property loss was in the neighborhood of $160 million. The estimated economic loss to riot-torn businesses was $504 million.

*Id.* Senator Long asserted that these "riots" impeded interstate commerce:

> Any riot, as we know and experience them today, generally does impede the flow of goods in interstate commerce. It stops the movement of people in interstate commerce. It interferes with the goods that were intended to move in interstate commerce.

12

114 Cong. Rec. 5535-36 (Mar. 6, 1968).

But the statutory definition of "civil disorder" involving "acts of violence by assemblages of three or more persons" (18 U.S.C. § 232(1)) has no connection to riots on the scale described by Senator Long.  Moreover, § 231(a)(3) does not target the destructive behavior attendant to a riot; the criminalized conduct is interference with an official's duties "incident to and during" a civil disorder.  The Congressional record contains no findings that individual interference with police and firefighters as defined under § 231(a)(3) substantially affects interstate commerce.  The third *Morrison* factor is not satisfied.

### D.    The Relationship Between § 231(a)(3)'S Activities and Any Effect on Interstate Commerce Is Too Attenuated

Any causal chain that could link the activity proscribed under § 231(a)(3) to any substantial impact on interstate commerce is too far attenuated to place the activity within reach of Congress' commerce authority. The offense conduct of § 231(a)(3) need not affect commerce directly.  It suffices to establish that a person's acts interfered with an official's duties performed "incident to and during" any "civil disorder" that, in turn, affects commerce.  Such an "incidental effect on interstate commerce . . . does not warrant federal intervention." *Musick v. Burke*, 913 F.2d 1390, 1397 (9th Cir. 1990).  The noneconomic conduct penalized by § 231 by definition is too attenuated to satisfy the "substantially affects" test for commercial impact.

Even if interference with police under § 231(a)(3) could affect commerce in the aggregate, when considered on a nationwide scale, that would be insufficient to place those acts within the federal commerce authority.  In *Morrison*, the Supreme Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect

on interstate commerce." 529 U.S. at 617. Here, the paucity of cases prosecuted under § 231(a)(3)

further negates any claim of an aggregate effect. In sum, the four *Morrison* factors demonstrate that

§ 231(a)(3) regulates purely local, noneconomic activities that do not "substantially affect" interstate

commerce. As a result, § 231(a)(3) falls outside of Congress's power to regulate under the

Commerce Clause.

## V.       Section 231(a)(3) Is Unconstitutional

> The Fifth Amendment provides that "[n]o person shall ... be deprived
> of life, liberty, or property, without due process of law." Our cases
> establish that the Government violates this guarantee by taking away
> someone's life, liberty, or property under a criminal law so vague that
> it fails to give ordinary people fair notice of the conduct it punishes,
> or so standardless that it invites arbitrary enforcement. The
> prohibition of vagueness in criminal statutes "is a well-recognized
> requirement, consonant alike with ordinary notions of fair play and the
> settled rules of law," and a statute that flouts it "violates the first
> essential of due process."

*Johnson v. United States,* 576 U.S. 591, 595 (2015) (internal citations omitted)

### A.       Section 231(a)(3)'s Vague Standards Fail to Provide Fair Notice and Risk Arbitrary Enforcement

Section 231(a)(3) fails the core tests for satisfying the certainty requirements of the Due

Process Clause. First, it is replete with vague and imprecise terms that fail to provide a person of

ordinary intelligence a reasonable opportunity to know what is prohibited:

- **"any act"** can include pure speech, expressive conduct, and grievous assaults;

- **"to obstruct, impede, or interfere"** leaves uncertainty as to whether it defines a culpable mens rea or a required result and, additionally, offers no objective limit requiring, for example, *forcible* interference or assault, *cf.* 18 U.S.C. § 111(a);

- **"incident to and during the commission of a civil disorder"** leaves the degree of connection with a "civil disorder" unclear and fails to state whether the defendant must have participated in the civil disorder;

- **"in any way obstructs, delays, or adversely affects commerce"** provides no limiting concept for what it means to obstruct, delay, or adversely affect commerce.

In addition, Section 231(a)(3) contains no express mens rea at all, leaving police, prosecutors, and judges to decide whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what) or neither. A statute's constitutionality under the vagueness doctrine is "closely related" to whether it contains an express mens rea requirement. *See Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("Because of the absence of a scienter requirement in the provision . . . the statute is little more than 'a trap for those who act in good faith.'") (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)).

The statute is prone to vagueness challenge because its terms are dependent on the subjective reaction of others, rather than the acts and intent of the defendant. In *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921), for example, the Supreme Court held that a prohibition on "unjust or unreasonable rate[s] or charge[s]" was unconstitutionally vague because assessment of whether charges were "unjust or unreasonable" was left entirely to the "estimation of the court and jury." *Id.* at 89. The Supreme Court likewise struck down an ordinance that criminalized behaving in a manner "annoying to persons passing by." *Coates v. City of Cincinnati*, 402 U.S. 611, 612 (1971). Because "[c]onduct that annoys some people does not annoy others," the ordinance did not "specif[y] any "standard of conduct . . . at all." *Id.* at 614. And in *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Court invalidated a statute that prohibited loitering "with no apparent purpose," because it improperly left "'it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" *Id.* at 60 (quoting *United States v. Reese*, 92 U.S. 214, 221 (1876)).

Here, § 231(a)(3) triggers criminal liability based on the reactions of others in two ways. First, it asks whether the defendant's conduct interferes with or impedes others. A gesture, sign, or other act that distracts one officer could have no impact at all another officer. Peacefully protesting alone or with a large crowd or while holding a banner or oversized sign or flag cold impact and interfere a law enforcement officer. Second, the statute asks whether the defendant's act is "incident to and during" a civil disorder in which the defendant may have no involvement at all. These subjective standards leave it to the discretion of police and prosecutors to determine whether a particular individual's conduct runs afoul of the law. In sum, § 231 suffers from the two infirmities of unconstitutionally vague criminal statutes: its terms are "so vague that it fails to give ordinary people fair notice of the conduct it punishes [and] so standardless that it invites arbitrary enforcement." *Johnson v. United States,* 576 U.S. 591, 595 (2015)

### B.      Section 231 Is Unconstitutionally Overbroad

The First Amendment to the United States Constitution prohibits Congress from, in relevant part, "abridging the freedom of speech . . . or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Section 231 is overbroad, in violation of Mr. Groseclose's First Amendment rights to speech and assembly. In the context of First Amendment expression, "an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992). Overbroad statutes "may have such a deterrent effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 (1984). Moreover, in the "First Amendment context, . . . a law may be invalidated as

16

overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 481 (2010). Here, the Court should either invalidate Section 231(a)(3) or else construe the statute so that its applications are limited to prohibiting unprotected acts of violence.

> 18 U.S.C. § 231 (emphasis added) provides a 5-year term of imprisonment for:

>> Whoever commits or attempts to commit *any act* to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way or degree obstructs, delays, or adversely affects* commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function

> 18 U.S.C. § 232(1) defines "civil disorder" as

>> any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual.

By making illegal "any act" which in "any way or degree obstructs, delays, or adversely affects . . . commerce or any federally protected function" extends to a substantial amount of constitutionally protected speech and expressive conduct in excess of the law's legitimate sweep. A broad criminal statutes like §231(a)(3) "must be scrutinized with particular care." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987); *see also Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement."). Criminal laws that "make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Id*. Several of the statute's terms are so left so broad and indefinite as to impose unqualified burdens on a range of protected expression.

Indeed, § 231 suffers from the same overbreadth that the Supreme Court held unconstitutional in *Hill.* As the Supreme Court explained in *Hill,* "the enforceable portion of the ordinance makes it "unlawful for any person to ... in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty," and thereby prohibits verbal interruptions of police officers." *Hill*, 482 U.S. at 461. By prohibiting "any act to obstruct, impede, or interfere with any . . . law enforcement officer . . . which in any way or degree obstructs, delays, or adversely affects" commerce or a federal function, Section 231 also prohibits verbal interruptions of police officers and other First Amendment protected activity, including interruptions caused by a peaceful demonstrator standing in protest, or someone holding a sign, or waiving a flag. Thus, by penalizing "any act," §231(a)(3) reaches to the outer limits of verbal and expressive conduct protected by the First Amendment without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content. *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill,* 482 at 162-63.

Second, § 231(a)(3) imposes a substantial burden on protected expression by prohibiting "any act . . . obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties." The term "interfere," which the statute leaves undefined, reaches a broad range of speech and expressive conduct. The law's author acknowledged this when, in a Senate hearing two days after he introduced the Civil Obedience Act, he criticized the term "interference" as used in the hate crime law by asking whether "almost anything could be regarded as an interference?" 114 Cong. Rec. 1819 (Feb. 1, 1968) (Sen. Long)). In the context of the § 231(a)(3), Senator Long's interpretation of "interference" rings true because "there are

18

numerous examples in which a person's speech could interfere with . . . a police officer in the lawful discharge of the officer's duties." *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D. S.C. 2013) (invalidating a state statute for overbreadth that made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties.").

Indeed, § 231(a)(3) authorizes a felony conviction for a bystander who yells at police to desist from an arrest, one who flips off officers to distract or to encourage resistance, one who records police activity with a cell phone. *Hill*, 482 U.S. at 459 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."); *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) ("[T]he First Amendment protects the filming of government officials in public spaces.").  The First Amendment does not permit such an unqualified prohibition on "interference" with police duties because "the freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state" *Hill*, 482 U.S. at 462–63 (1987).

Third, the term "civil disorder," as defined under § 232(1), is extremely far-reaching, applying to "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of . . . injury to the property."  Rather than limiting the statute, § 231(a)(3)'s language reaches "any public disturbance" in the types of traditional public fora where First Amendment protections are at their zenith. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir.2009) ("In traditional public fora . . . First Amendment protections are strongest, and regulation is most suspect.").

Moreover, the "civil disorder" definition sweeps broadly to cover incidents in which three or more persons cause an immediate danger of injury to persons or property. 18 U.S.C. § 232(1). The definition can just as easily be met by a violent mob of thousands as it can by the ejection of several unruly individuals from a bar, concert, or sporting event, or by three teenagers whose skateboarding damages property, or by three persons, who while participating in an otherwise peaceful political demonstration, engage in violence on their own without the participating or consent of the other peaceful demonstrators. Finally, to be convicted under § 231(a)(3), a person's interference with police duties must merely occur "incident to and during" the civil disorder, and it need not be shown that the defendant incited the civil disorder or engaged in "acts of violence" that the civil disorder "involves." The term "civil disorder" fails to limit the overbreadth of penalizing "any act" of interference with police duties. The statute criminalizes mere presence at a protest where violence occurs – even if that violence is caused by counter protestors and even if that presence involves nothing more than peacefully picketing or protesting if it obstruct, impedes or interferes with a law enforcement officers.

Lastly, § 231 is is not narrowly tailored to achieve a compelling government interest. Indeed, it serves no legitimate purpose whatsoever because existing laws already prohibit threatening, intimidating, and violent conduct. Section 231 is unconstitutionally overbroad and not narrowly tailored to serve a legitimate government interest. The statute risks impermissibly criminalizing the protected First Amendment activity of non-violent protestors who choose to peacefully exercise their right to protest but find themselves in close proximity to conduct of others. The Act also unconstitutionally criminalizes such basic expressive conduct as standing on the street and hindering any traffic, even temporarily. As was seen with the social justice demonstrations during 2020, the

ordinance's plain language has been violated in Washington, D.C. scores of times,  yet only some

individuals, chosen by prosecutors "in their unguided discretion" were arrested and prosecuted."

*Hill*, at 466.  Section 231 as the Houston statute under review in *Hill*,

> Far from providing the "breathing space" that "First Amendment
> freedoms need ... to survive," NAACP v. Button, 371 U.S. 415, 433
> (1963), the ordinance is susceptible of regular application to protected
> expression. We conclude that the ordinance is substantially overbroad,
> and that the Court of Appeals did not err in holding it facially invalid.

Hill, 482 U.S. at 467.

By enacting subsection 3 of the Civil Obedience Act, Congress created "a criminal prohibition

of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010).  The "very existence" of

statutes like § 231(a)(3) is pernicious because it "may cause others not before the court to refrain

from constitutionally protected speech or expression." *Members of City Council of L.A. v. Taxpayers

for Vincent*, 466 U.S. 789, 799 (1984).  The mere "threat of enforcement of an overbroad law may

deter or 'chill' constitutionally protected speech," "especially when the overbroad statute imposes

criminal sanctions."  *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

As with the law at issue in *McCoy v. City of Columbia*, which made it unlawful "for any

person to interfere with or molest a police officer," § 231(a)(3)'s vagueness chills protected speech.

*McCoy*, 929 F. Supp. 2d 541, 547-53 (D.S.C. 2013).  By expansively encompassing "any act" that

could interfere with the duties of a police officer or firefighter during a civil disorder, § 231(a)(3) is

not limited to "violent acts" or acts that result in bodily injury or that otherwise put persons or

property in imminent danger. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he

constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe

advocacy of the use of force or of law violation except where such advocacy is directed to inciting

or producing imminent lawless action and is likely to incite or produce such action.").  The statute

does not weed out those acts with expressive content or those that occur in a traditional public forum.

Section 231(a)(3) reaches a substantial amount of expressive conduct, and without clear boundaries,

the law chills free speech.

With respect to both vagueness and overbreadth, the Chief Judge of the Northern District of

Florida entered a preliminary injunction against enforcement of an "anti-riot" law enacted by the

Florida legislature in the wake of the *Black Lives Matters* demonstrations, which is materially

indistinguishable from § 231 in a number of key respects.  *Dream Defenders v. DeSantis*, __ F.3d

___, 2021 WL 4099437 (N.D. Fla., 2021).  The riot law was enjoined based on its unconstitutional

vagueness and overbreadth.  A comparison of the enjoined Florida riot law and 18 U.S.C. § 231(a)(3)

show the similarities:

> A person commits a riot if he or she willfully participates in a violent
> public disturbance involving an assembly of three or more persons,
> acting with a common intent to assist each other in violent and
> disorderly conduct, resulting in:
>
> (a) Injury to another person;
> (b) Damage to property; or
> (c) Imminent danger of injury to another person or damage to
> property.

§ 870.01(2), Fla. Stat. (2021).

Among other reasons for enjoining the Florida riot law, the Chief Judge found the statutory

terms unconstitutionally vague.  *Dream Defenders*, 2021 WL 4099437, at *27.  (N.D. Fla., 2021).

The district court found vagueness in the definition of "riot" as a "violent public disturbance," which,

like in § 231(a)(3)'s "civil disorder," consisted of violent acts by "three or more persons."  *Id*. ("an

individual of ordinary intelligence . . . would not know if this law meant that she had to merely avoid

sharing a common intent to assist two others in violent and disorderly conduct, or if she had to avoid participating in any public event where such violent and disorderly conduct could occur. The vagueness of this definition forces would-be protesters to make a choice between declining to jointly express their views with others or risk being arrested").  The district court further explained that "the vagary of this statute empowers law enforcement officers to exercise their authority in arbitrary and discriminatory ways. Because the statute leaves unclear who must share what intent to be arrested, law enforcement officers, prosecutors, and courts cannot rely, and cannot be held to rely, on objective standards. Without at least "minimal guidelines," "a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' *Id.*

Similarly, the district court overbreadth in the fact that the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts necessary to satisfy the definition of a "violent public disturbance." *Id.* at *29  (as explained above, the statute is vague because it is subject to multiple reasonable constructions. It is also not subject to a limiting construction. Second, considering the statute's ambiguous scope, it is overbroad. To be sure, the statute criminalizes a large amount of unprotected activity.  But, in its ambiguity, it also consumes vast swaths of core First Amendment speech. Because it is unclear whether a person must share an intent to do violence and because it is unclear what it means to participate, the statute can plausibly be read to criminalize continuing to protest after violence occurs, even if the protestors are not involved in, and do not support, the violence. The statute can also be read to criminalize other expressive activity, like remaining at the scene of a protest turned violent to film the police reaction").

23

**C.      Section 231(a)(3) Cannot Be Saved by Construction Without Violation the Constitutional Separation of Powers**

A statute's vagueness or overbreadth does not permit judges to "'rewrite [the] . . . law to conform it to constitutional requirements.'" *Stevens*, 559 U.S. at 481.  "When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).  "Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *Id.* at 2325. In the present case, the statute's scope "may entirely depend" on a law enforcement official's unbounded speculation about subjective factors, *Coates*, 402 U.S. at 614, thus subjecting "individuals to the risk of arbitrary or discriminatory prosecution and conviction," *United States v. Kozminski*, 487 U.S. 931, 949-950 (1988) (holding statute unconstitutionally vague where liability "depend[ed] entirely upon the victim's state of mind").

It does not matter whether some conduct clearly falls within § 231(a)(3)'s reach. The Supreme Court's holdings "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson,* 576 U.S. at 602; *accord Dimaya*, 138 S. Ct. at 1214 n.3 (reaffirming this principle).  Section 231(a)(3) is not susceptible to construction that eliminates its many constitutional deficiencies without judicial encroachment on the legislative function of defining criminal laws.  Accordingly, Count One of the Superseding Indictment should be dismissed with prejudice.

**CONCLUSION**

For all the foregoing reasons, Count One of the Superseding Indictment which charges a violation of 18 U.S.C. § § 231(a)(3) should be dismissed.

Respectfully submitted,

/s/ Carmen D. Hernandez
Carmen D. Hernandez
Bar No. MD 03366
7166 Mink Hollow Rd
Highland, MD 20777
240-472-3391
chernan7@aol.com

**CERTIFICATE OF SERVICE**

I hereby certify that the instant Motion was served this 1st day of April, 2022 via ECF on all counsel of record.

/s/ **Carmen D. Hernandez**
**Carmen D. Hernandez**