UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **JEREMY DANIEL GROSECLOSE**, <br><br> Defendant. | Case No. 21-cr-311 (CRC) |

## MEMORANDUM OPINION

Defendant Jeremey Daniel Groseclose was charged with six criminal counts related to his conduct at the U.S. Capitol on January 6, 2021.  Following a three-day bench trial, the Court rendered a partial verdict against Groseclose, finding him guilty on four of the charges.  For the remaining two offenses—knowingly entering or remaining, and knowingly engaging in disorderly or disruptive conduct, in a "restricted building or grounds" in violation of 18 U.S.C. §§ 1752(a)(1) and (a)(2)—the Court reserved judgment and directed the parties to brief what the government must prove to establish that a defendant acted "knowingly" within the meaning of those provisions.  More specifically, the Court requested briefing on whether the government need only prove that Groseclose knew that the Capitol was "posted, cordoned off, or otherwise restricted" on January 6 or whether it must also prove that he knew that then-Vice President Mike Pence, a Secret Service protectee, was temporarily visiting the Capitol that day.

Having received both sides' briefs on the matter, and conducted additional research on its own, the Court concludes that the government must prove knowledge as to both elements which, taken together, collectively define "restricted building or grounds" under the statute.  Because the government did not meet its burden on the second score, the Court must acquit Groseclose on the two outstanding counts.

I.     **Background**

       In addition to four other offenses, Mr. Groseclose was charged with two counts under 18

U.S.C. § 1752 for his conduct in a "restricted building or grounds" on January 6.  Count 3 of the

Superseding Indictment charges Groseclose with "knowingly enter[ing] or remain[ing] in [a]

restricted building or grounds without lawful authority to do so," in violation of § 1752(a)(1).

Count 4 charges him with "knowingly, and with intent to impede or disrupt the orderly conduct

of Government business or official functions, engag[ing] in disorderly or disruptive conduct in,

or within such proximity to, any restricted building or grounds when, or so that, such conduct, in

fact, impedes or disrupts the orderly conduct of Government business or official functions," in

violation of § 1752(a)(2).  "[R]estricted building or grounds," a central term in both provisions,

is defined in § 1752(c)(1):

> [T]he term "restricted buildings or grounds" means any posted, cordoned off, or
> otherwise restricted area—
>
>> (A) of the White House or its grounds, or the Vice President's official
>> residence or its grounds;
>>
>> (B) of a building or grounds where the President or other person protected
>> by the Secret Service is or will be temporarily visiting; or
>>
>> (C) of a building or grounds so restricted in conjunction with an event
>> designated as a special event of national significance[.]

So defined, "restricted building or grounds" is a term of art containing two elements: (1) the area

is "posted, cordoned off, or otherwise restricted" and (2) one of the three triggering conditions—

either § 1752(c)(1)(A), (B), or (C)—is satisfied.

       Assembling these puzzle pieces is easy work when it comes to the act element.  Both

sides agree that, to prove a defendant guilty under § 1752(a)(1), the government must

demonstrate that he "enter[ed] or remain[ed] . . . without lawful authority" in an area that was

"posted, cordoned off, or otherwise restricted" and that one of the three criteria above is met. Here, the government attempted to meet its burden via the second criterion by proving that Groseclose unlawfully entered the Capitol building and grounds when those areas were restricted while a "person protected by Secret Service," Vice President Pence, was "temporarily visiting." The same goes for § 1752(a)(2), only substitute "engag[ed] in disorderly or disruptive conduct" for "enter[ed] or remain[ed]."

The difficulty increases, and the dispute emerges, when moving from the act element to the mens rea requirement. Sections 1752(a)(1) and (a)(2) both start with the scienter requirement that a defendant act "knowingly," and the parties differ over just how far that mens rea requirement reaches. In the government's eyes, "knowingly" extends only to the first half of the "restricted building or grounds" definition: A defendant must know the area is "posted, cordoned off, or otherwise restricted" but need not know anything else (i.e., he does not need to know that either § 1752(c)(1)(A), (B), or (C) is satisfied). Groseclose, by contrast, reads "knowingly" to modify the entire statutory definition of "restricted building or grounds," including that one of the three conditions that makes a "restricted area" (a colloquial phrase) a "restricted building or grounds" (the statutorily defined element) is satisfied. To prove that he had knowledge as to the element, Groseclose contends, the government must prove that he knew Vice President Pence was inside the Capitol on January 6.

The parties are not alone in their disagreement. The issue of what "knowingly" applies to in §§ 1752(a)(1) and (a)(2) has divided courts in this District. Some have adopted the government's position that "knowingly" applies to the first portion of the statutory definition for "restricted building or grounds," but not the second. See, e.g., United States v. Griffin, No. 21-cr-92 (TNM), ECF No. 106, at 330–32; United States v. Samsel, No. 21-cr-537 (JMC), ECF No.

313 (provisionally accepting the government's position); <u>United States v. Eicher</u>, No. 22-cr-38 (BAH), June 14, 2023 Trial Tr. at 8; <u>United States v. Vo</u>, No. 21-cr-509 (TSC), Sept. 22, 2023 Trial Tr. at 1199–1200.  Others have opted for Groseclose's reading, holding that "knowingly" modifies all, not just part, of what constitutes a "restricted building or grounds" under the statute. <u>See, e.g.</u>, <u>United States v. Hostetter</u>, No. 21-cr-392 (RCL), 2023 WL 4539842 (D.D.C. July 13, 2023); <u>United States, v. Elizalde</u>, No. 23-cr-170 (CJN), 2023 WL 8354932 (D.D.C. Dec. 1, 2023).  This Court now throws its hat into the ring.

## II.   Analysis

### A.   <u>"Knowingly" Applies to "Restricted Building or Grounds" in its Entirety</u>

The Court begins with the text.  Section 1752(a)(1) requires that the defendant "knowingly enter[] or remain[] in any restricted building or grounds without lawful authority to do so."  Section 1752(a)(2) similarly penalizes any individual who "knowingly . . . engages in disorderly or disruptive conduct in . . . any restricted building or grounds."  The first order of business is to determine which of these statutory elements "knowingly" modifies.

Both sides agree on the answer: all of them.  The government concedes that the statute's knowledge requirement does not stop at the immediately preceding verbs ("enters," "remains," and "engages") but extends to cover "restricted building or grounds."  <u>See</u> Nov. 21, 2023 Trial Tr. at 5–6.  For good reason.  Time and again, the Supreme Court has explained that, as "a matter of ordinary English grammar, we normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime."  <u>Rehaif v. United States</u>, 139 S. Ct. 2191, 2196 (2019) (quotation marks omitted); <u>accord</u> <u>Flores-Figueroa v. United States</u>, 556 U.S. 646, 652 (2009) ("[C]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element.").  Therefore, "[u]nder

the most natural reading of this provision, the word 'knowingly' applies not just to the statute's verbs but also to the object of those verbs." <u>McFadden v. United States</u>, 576 U.S. 186, 191 (2015).  The object in §§ 1752(a)(1) and (a)(2) is "restricted building or grounds."  Based on the most natural reading of the statute, then, a defendant must know that the conduct at issue occurred in a "restricted building or grounds."  So far, so good.

The going gets tougher when it comes to what exactly it means for "knowingly" to apply to "restricted building or grounds."  Because "restricted building or grounds" is a statutorily defined term, both sides accept that one cannot intuit what it means for an area to be "restricted" in the colloquial sense but instead must look to the statute's definitional section.  But after turning to that provision, the government picks apart the statutory definition by reading "'knowingly' to apply to the opening clause of Subsection (c)(1), but no farther."  Gov't Br. at 3. In other words, the government would apply "knowingly" to the first half of the statutory definition requiring that the area be "posted, cordoned off, or otherwise restricted" but not to the second half of the definition requiring that the area be restricted in conjunction with one of the three criteria specified in § 1752(c)(1)(A), (B), and (C).

The statute's plain text offers little support for this reading.  "[R]estricted building or grounds" is a term of art in the statute.  When §§ 1752(a)(1) and (a)(2) criminalize conduct within a "restricted building or grounds," they are only prohibiting actions occurring within an area that satisfies the entirety of § 1752(c)'s definition for that element.  This is obvious when it comes to the statute's act element.  As noted above, the government acknowledges that it must show that Groseclose unlawfully entered a "restricted building or grounds."  To do so, it must prove both that the Capitol was "posted, cordoned off, or otherwise restricted" and that Vice President Pence was present at the Capitol that day.  From a purely textual standpoint, what is

true of the act element is equally true of the mens rea requirement.  For a defendant to have known that the area he entered was a "restricted building or grounds," it is not enough that he knew the area was cordoned off.  A barn and cornfield surrounded by a posted fence may be "restricted" in the quotidian sense, but they are not a "restricted building or grounds" under a plain reading of the statute.  More is required.  Namely, a defendant must have known that both parts of the statutory definition were met—that he was entering a "posted cordoned off, or otherwise restricted area . . . of a building or grounds where [a] person protected by the Secret Service [was] temporarily visiting."  42 U.S.C. § 1752(c)(1).

The government resists this outcome with a few textual points of its own.  It correctly notes that while courts "*normally* read the statutory term 'knowingly' as applying to all the subsequently listed elements," this is not an ironclad rule.  Rehaif, 139 S. Ct. at 2196 (emphasis added and quotation marks omitted).  Where "the modifier 'knowingly' introduces a long statutory phrase, . . . questions may reasonably arise about how far into the statute the modifier extends."  Id.  But such questions do not arise here because, as Judge Nichols explained in Elizalde, Groseclose's preferred "reading does not impute 'knowingly' to far-away subsections. Instead, [his] reading simply incorporates the statutory definition where (a)(1) and (a)(2) use the defined term.  Thus, 'knowingly' does not travel down from (a)(1) or (a)(2) to modify (c)(1).  Rather, it applies to the phrase 'restricted building or grounds' in (a)(1) and (a)(2) which, because of the statutory definition, means what the statutory definition says."  2023 WL 8354932, at *3.  This is a familiar feature of cases extending "knowingly" to statutorily defined elements.  In Rehaif, for example, the Supreme Court had no trouble concluding that 18 U.S.C. § 924(a)(2)'s penalty for anyone who "knowingly violates subsection . . . (g) . . . of section 922" required the government to prove the defendant knowingly violated all of § 922(g)'s statutory

elements, including that the "defendant knew both that he engaged in the relevant conduct (that he possessed a firearm) and also that he fell within the relevant status (that he was a felon, an alien unlawfully in this country, or the like)." 139 S. Ct. at 2194.  Similarly, when interpreting 21 U.S.C. § 841's prohibition on "knowingly" possessing "a controlled substance" in McFadden, the Supreme Court did not distinguish the act element from the mens rea requirement and hold that a defendant need only know the substance he possesses is "controlled" in some colloquial sense.  The Justices instead peered over to the definition of "controlled substance" nearly forty sections earlier as a "drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V" and held that a defendant must know "that the substance he is dealing with is some unspecified substance listed on [those] federal drug schedules."  576 U.S. at 192 (quoting 21 U.S.C. § 802(6)).[1]

The same principle applies here.  Knowingly immediately precedes "restricted building or grounds," and there is no question that it modifies that element of the offense.  "[R]estricted building or grounds," in turn, is a statutorily defined term with two component parts—(1) the area is restricted in some way and (2) a Secret Service protectee is visiting the area (or one of the

---

[1] McFadden's logic also largely dispenses with the government's observation that reading "knowingly" to extend to 18 U.S.C. § 1752(C)(1)(b) "invites more questions than it answers" because that subsection contains "additional references to other sections of the U.S. Code."  See Gov't Br. at 5.  As it points out, § 1752(c)(2) defines the term "other person protected by the Secret Service" to mean "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection."  The government wonders just how much of this a defendant is required to know.  Id.  McFadden provides an answer.  There, the Supreme Court held that a defendant has the requisite knowledge if he knows the substance he possesses (even if he does not know it is listed on the schedules) or if he knows the substance in his possession appears on the schedules (even if he does not know what the substance is).  576 U.S. at 192.  Applying a similar logic here, a defendant can satisfy the knowledge requirement if he knows a particular protectee is in the area (even if he knows nothing of the person's secret-service protection) or if he only generally knows that the Secret Service is protecting some individual in the area (even if he is unsure of that individual's identity).

other two statutory criteria is met).  A straightforward application of the knowledge requirement to an element found in its direct vicinity therefore leads to the conclusion that the defendant must have knowledge as to the entirety of § 1752(c)(1)'s definition, not just the first half.

Perhaps sensing that the plain text disfavors its preferred interpretation, the government next urges the Court to read that text in light of the provisions' statutory history.  But after taking this legislative foray, the Court is uncertain whether it helps or hurts the government's case.  The prior iteration of § 1752(a)(1) made it a crime to "willfully and knowingly . . . enter or remain in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  Pub. L. No. 109-177, 120 Stat. 192, 252 (2006).  The government focuses on the first word, "willfully," and construes its subsequent elimination in later versions of the statute as a clear indicator that Congress sought to lower the mens rea requirement.  See Gov't Br. at 12.  The observation is accurate, so far as it goes.  The elimination of "willfully" relieved the government of having to prove that a defendant intentionally violated a known legal duty to remain outside the restricted area.  Yet it is hard to glean from the deletion whether Congress sought to dilute the statute's "knowingly" requirement, which remained in place.

Moreover, note that "the President or other person protected by the Secret Service is or will be temporarily visiting" was once in the body of the provision, rather than in a separate definitional section.  This seems to cut against the government's contention that the Court should not read "knowingly" to extend to the statute's "far-away" definitional subsection because, as originally drafted, these elements were in close conjunction.  And contrary to the government's position, the Court does not view the movement of this language into a definitional section as an effort to cleave it from the scienter element's grasp.  See id.  The statutory reorganization instead

was aimed to achieve efficiency by eliminating the need to repeat this element in each subsequent provision, see 18 U.S.C. § 1752(a)(3) (2006) (referring to "any building or grounds described in paragraph (1) or (2)"), which would have become even clunkier with the addition of § 1752(C)(1)(A) specifically protecting the White House. The drafting history thus offers weak support for diverging from the plain text of the current law on the books.

As its final textual point, the government contends that the customary presumption of extending a mens rea requirement to all elements of a crime does not apply in this case because the second half of the "restricted building or grounds" definition is not necessary to delineate innocent from criminal conduct. See Gov't Br. at 5–9. The D.C. Circuit has "made clear [that] the presumption in favor of mens rea [is] triggered by the need to avoid imposing substantial penalties—including jail sentences—on innocent citizens who *had no idea* they were committing a crime." United States v. Burwell, 690 F.3d 500, 506–07 (D.C. Cir. 2012) (en banc) (emphasis added). That is because the presumption in favor of mens rea developed "for one particular reason: to avoid criminalizing otherwise lawful conduct." Id. at 505. When the prescribed conduct is otherwise unlawful with or without a given element, the presumption does not apply because there is no danger that dispensing with the mens rea requirement for that element would set a "snare for the unsuspecting." United States v. Feola, 420 U.S. 671, 685 (1975). Here, the government contends that limiting the reach of "knowingly" would create no such trap because the charged conduct would be unlawful regardless of whether the second half of § 1752(c) is met. For instance, a defendant who enters an area he knows to be restricted while also knowing he lacks authority to be there has trespassed regardless of whether he also knows that a protectee is on the premises. See Wayne R. LaFave, Substantive Criminal Law § 21.2(c) (3d ed. 2022) (noting that criminal trespass derives from the common-law offense, which was typically defined

as "any unauthorized entry on the land of another or unlawfully remaining on the premises of another"); D.C. Code § 22-3302 (criminalizing trespass along similar lines and imposing a punishment of up to six months' imprisonment). The government thus concludes that there is no requirement that the Court extend "knowingly" to elements that do not separate innocent from wrongful conduct.

This argument flips the rules of statutory interpretation on their head. The presumption in favor of a mens rea requirement for all elements that separate entirely innocent from otherwise wrongful conduct is supposed to serve as a buffer *against* the most natural reading of the text. Either when there is no specified scienter or when the most grammatical reading of the law does not support extending the mens rea requirement, this presumption stacks the deck against finding that Congress sought to deviate from the common-law rule requiring criminal culpability for each element. See, e.g., Morissette v. United States, 342 U.S. 246, 248 (1952) (no mens rea specified in the statute); United States v. X-Citement Video, Inc., 513 U.S. 64, 68–72 (1994) (extending "knowingly" even though it was not the "most natural grammatical reading"). But no deck stacking is needed when, as here, the statute's plain text *supports* extending the specified mens rea requirement. The presumption that "knowingly" applies to all subsequent elements—a presumption rooted in normal English usage—operates independently of the distinct common-law presumption that every element separating innocent from wrongful conduct have a scienter requirement. See Flores-Figueroa, 556 U.S. at 650–53. The absence of one presumption does not nullify the other.

Lacking textual support, the government seeks higher ground by moving to contextual considerations. It makes a purpose-based argument that Congress could not have intended to stretch the mens rea requirement so far and thus, even if it is not the most natural reading, the

Court should limit the requirement to the first half of "restricted building or grounds." This position finds some support. When laying out the general rule that "knowingly" normally modifies all subsequent elements, the Supreme Court cautioned against applying the rule in an overly wooden manner. Whether "a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent." Rehaif, 139 S. Ct. at 2195. Although "[t]he best evidence of that purpose is the statutory text adopted by both Houses of Congress and submitted to the President," All. of Artists & Recording Cos. v. Gen. Motors Co., 162 F. Supp. 3d 8, 20 (D.D.C. 2016) (citation omitted), the text should not be read in a vacuum. Instead, "the inquiry into a sentence's meaning is a contextual one." Flores-Figueroa, 556 U.S. at 652. Occasionally "special contexts" or certain "background circumstances" may require reading statutory text in a way that deviates from its most grammatical reading. Id.; see also id. at 660 (Alito, J., concurring) ("In interpreting a criminal statute . . . , I think it is fair to begin with a general presumption that the specified mens rea applies to all the elements of an offense, but it must be recognized that there are instances in which context may well rebut that presumption."). One notable example is sex crimes against minors. Given the deep-rooted presumption in favor of strict liability for such offenses, see X-Citement Video, 513 U.S. at 72 n.2, courts oftentimes have deviated from the statute's literal meaning and held that the scienter requirement does not apply to the victim's age, see, e.g., United States v. Chin, 981 F.2d 1275, 1279–80 (D.C. Cir. 1992); United States v. Morgan, 45 F.4th 192, 205–08 (D.C. Cir. 2022).

The government posits that a more contextual understanding of the statute's purpose here offers a "convincing reason to depart" from its plain text. Rehaif, 139 S. Ct. at 2195. Section 1752's raison d'être is "to ensure the safety of Secret Service protectees." Gov't Br. at 11; see also United States v. Puma, 596 F. Supp. 3d 90, 114 (D.D.C. 2022) ("[T]he goal of Section 1752

is to provide the fullest protection possible for Secret Service protectees.").  In the government's view, a "requirement that a defendant know, or be on notice of, a particular protectee's location in order to violate the statute is clearly antithetical to that goal."  Gov't Br. at 11–12.  After all, requiring the Secret Service to post that the Vice President is in the building in order to sweep individuals within the prohibition's ambit would tend to make the Vice President less safe, not more.

The Court appreciates the concern but disagrees with the conclusion.  Congress doubtless enacted and later amended § 1752 for the important purpose of safeguarding the nation's two highest elected officials and other Secret Service protectees, as well as the Secret Service itself.  And it is surely possible to imagine scenarios in which an individual may pose an equally dangerous threat to a protectee regardless of whether he knows the protectee was within the vicinity.  Indeed, many of the Capitol rioters would fall into that category.  But whether this contextual background justifies deviating from the statute's most grammatical reading is a different question.  "[N]o legislation pursues its purposes at all costs," so it is a fallacy to "assume that *whatever* furthers the statute's primary objective must be the law."  Rodriguez v. United States, 480 U.S. 522, 525–26 (1987) (per curiam).  Here, it is far from absurd to think that Congress sought to punish trespassers who appreciated the added security concerns posed by the presence of a Secret Service protectee but disregarded them anyway.  In fact, as discussed below, the legislative history suggests that Congress may have believed that a person who disregards these aggravating factors is more culpable and thus deserving of the stiff penalty of up to one year imprisonment.  See 18 U.S.C. § 1752(b)(2).  That comes as no surprise.  Many would agree that the person who jumps the White House fence is worthier of punishment than the person who ignores "keep out" signs posted around an area that is typically open to the public and, to his

surprise, stumbles upon the President.  Thus, just as Congress thought it inappropriate to punish those who recklessly or negligently find themselves in a "restricted area or ground," it apparently determined that it was not enough for a person to know only one half of the equation.  It is also hardly unreasonable to believe Congress would have deemed an individual who knowingly breaches a "restricted building or grounds" as more likely to pose a security threat than the trespasser who has no clue what lies on the other side of the posted signs.  Finally, carrying the mens rea requirement all the way through would not prevent law enforcement on the scene from taking appropriate action to mitigate the threat.  It would only limit federal prosecutors' ability to bring this particular charge after the fact.  If a goal of criminalizing the conduct at issue here is to deter it in the first place, that could well have been a logical balance to strike.

This analysis bleeds into the government's last argument for limiting "knowingly" to the first portion of "restricted building or grounds":  The second half of the statutory definition is simply intended to establish federal jurisdiction over the offense and, as a result, need not have been in the mind of the defendant at the time that he committed it.  While the government raises this argument only in a footnote, see Gov't Br. at 4 n.2, it offers the most compelling reason for not extending the mens rea requirement all the way to § 1752(c)(1)(A), (B), and (C).  But it is still not enough to carry the day.

Jurisdictional elements are subject to a different set of rules when it comes to mens rea.  Even if a plain grammatical reading suggests otherwise, scienter requirements usually do not apply to purely jurisdictional elements because they "normally have nothing to do with the wrongfulness of the defendant's conduct."  Rehaif, 139 S. Ct. at 2196.  For example, a felon need not know that the gun he possesses has traveled through interstate commerce because that fact bears no relation to why it is wrong for him to possess a firearm; it simply serves as the basis

for federal jurisdiction.  See id.  But this principle has limits.  As the Supreme Court explained in

United States v. Feola, "[t]he question . . . is not whether the requirement is jurisdictional, but

whether it is *jurisdictional only*."  420 U.S. at 676 n.9 (emphasis added).

      If what is meant by "jurisdictional only" is that the requirement does not speak to the

wrongfulness of the conduct but is instead aimed exclusively at providing a basis for bringing the

charge in federal court (much like the interstate-nexus requirement), the requirement here that

the grounds in question be the President's or Vice President's residence or that a Secret Service

protectee be present do not fit the bill.  Leaping the White House fence and invading the Naval

Observatory grounds are graver offenses than trespassing any random cordoned-off area.  And is

particularly wrongful, as Congress has found, to trespass or otherwise cause havoc in an area

where the Secret Service is attempting to safeguard a protectee.  See Gov't Br. at 9–12

(recounting legislative history).  One need look no further than this case.  Many of the Capitol

rioters, including Mr. Groseclose, have been charged with both disorderly conduct in a Capitol

Building and disorderly conduct in a "restricted building or grounds" based on exactly the same

activity.  Yet the first offense is a Class B misdemeanor carrying a maximum of six months'

imprisonment whereas the second is a Class A misdemeanor with imprisonment up to one year.

Compare 40 U.S.C. § 5109(b) (prescribing a maximum penalty of six months' imprisonment for

violations of § 5104(e)(2)), with 18 U.S.C. § 1752(b)(2) (setting a penalty of "imprisonment for

not more than one year").  The increased seriousness of the § 1752(a) offenses is also reflected in

the federal Sentencing Guidelines.  While a standard trespass offense falls at base level 4, the

offense is bumped by 2 levels if the trespass occurred at "any restricted building or grounds" and

by 4 levels if it happened "at the White House or its grounds, or the Vice President's official

residence or its grounds."  USSG 2B2.3.  Any factor that justifies doubling the maximum

punishment and increasing the guideline offense level by 50–100% is not "jurisdictional only" in the same way as an interstate-nexus requirement.

But there is another way of reading Feola's "jurisdictional only" language that offers the government greater purchase here. In Feola, the Supreme Court explained that "the significance of labeling a statutory requirement as 'jurisdictional' is not that the requirement is viewed as outside the scope of the evil Congress intended to forestall, but merely that the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." 420 U.S. at 676 n.9. From this perspective, finding that an element is "jurisdictional only" requires reaching a conclusion, based on the statute's text viewed in light of the broader context, that Congress did not intend to attach a scienter requirement to the element.

That was the case in Feola. There, the Supreme Court determined that the defendant need not have known that the person he was assaulting was a federal officer because that element of 18 U.S.C. § 111 was "jurisdictional only" given that the statute, which largely duplicated state-law criminal provisions, was chiefly aimed at ensuring a federal forum in which to prosecute those who had harmed federal officers. See 420 U.S. at 684 ("We conclude, from all this, that in order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in the federal courts, § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer."). In reaching that result, the Feola majority focused on two interrelated aspects of the provision at issue. It first concluded that § 111 was not an aggravated assault statute designed to impose a special penalty on those who knowingly injured a law enforcement officer. See id. at 683–84. Instead, the majority found that the provision merely

duplicated run-of-the-mine assault statutes, on the books in every State, that apply regardless of the victim's identity.  See id.  It next found that construing the federal provision as duplicating ordinary assault statutes did not render § 111 redundant because Congress sought to achieve an important federal purpose by conferring federal jurisdiction over these types of cases.  After reviewing the legislative history of § 111—which was originally passed in 1934 soon after Prohibition—the Feola majority found an intent to create a federal forum due to a fear that some state prosecutors, who may be hostile to federal law enforcement initiatives, "would not always or necessarily share congressional feelings of urgency as to the necessity of prompt and vigorous prosecutions of those who violate the safety of the federal officer."  Id. at 684.  Section 111's chief aim was thus to hand these cases over to federal prosecutors to achieve "the highest possible degree of certainty that those who killed or assaulted federal officers were brought to justice."  Id.  In this sense, the fact that the victim happened to be a federal officer was not an aggravating factor that made the conduct more heinous and deserving of heightened punishment. It was instead a "jurisdictional only" element designed to remove cases from local courts and place them into the federal-court system.

If the Court were to focus only on § 1752 as it stood when first enacted as part of the Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, 84 Stat. 1880, 1891–92 (1971), it would be hard-pressed to see meaningful daylight between Feola and the present case.  While Congress in 1970 may not have been motivated by a skepticism of state prosecutors' willingness to defend Secret Service protectees by bringing wrongdoers to justice, as in Feola, Congress was motivated by a desire to federalize ordinary state-law offenses in order to achieve more certainty and uniformity over security measures involving important federal officers—namely, the President, who was the only person protected under the original law.  The Senate Report

explained that the new law was "designed to provide a uniform minimum of Federal jurisdiction for Presidential security when the President is on temporary visits." S. Rep. 91-1252, at 6 (1970).  Before the enactment of § 1752, the report noted, the "Secret Service [had to] rely upon the assistance of local authorities to arrest persons who may be guilty of such disruptive conduct.  In a quieter era, this system worked relatively well.  [By 1970], however, it ha[d] become increasingly difficult to maintain the necessary level of security in this method."  Id. at 7.  For example, it was often "difficult to tell exactly which jurisdiction [bore] the responsibility for detention and prosecution.  Moreover, each jurisdiction utilize[d] different criminal statutes, with different elements of crime, which ma[de] Secret Service agents unsure of the legal extent of their authority and ma[de] uniform enforcement impossible."  Id.  The new federal law sought to solve these problems.  But it did not create a new aggravated offense.  The Report hastened to add that "almost everything proscribed in subsection (a) is presently outlawed in some form or other at the State or local level.  Subsection (a) makes these activities a Federal offense so that the Secret Service has the authority to prevent such activities."  Id.  Consistent with that purpose, the original penalty for violating § 1752 was capped at six months' imprisonment, see 18 U.S.C. § 1752(b) (1970).  That is the same penalty commonly leveled against ordinary trespassers, see, e.g., D.C. Code § 22-3302, and the same one that federal law imposes against those who disrupt congressional proceedings during the normal course of business when no Secret Service protectee is visiting, see 40 U.S.C. § 5109(b).  Viewed from this perspective, the requirement that a Secret Service protectee be on the premises would appear to be "jurisdictional only" in much the way Feola described.

Section 1752 was cast in a different light, however, when Congress amended it as part of the USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120

Stat. 192 (2006).  In addition to redrafting the statute to place the three triggering conditions into the definitional section, Congress also doubled the maximum penalty from six months to one year.  This significant increase was not mere penalty inflation.  The House Conference Report explained that it was "doubl[ing] the statutory penalties (from 6 months to 1 year) for violations of § 1752, to make the penalty consistent with the prescribed penalty under 18 U.S.C. § 3056(d) (interference with Secret Service law enforcement personnel generally)."  H.R. Conf. Rep. 109-333, at 110.  Section 3056(d), in turn, defines the Secret Service's various duties and proscribes that "[w]hoever knowingly and willfully obstructs, resists, or interferes with a Federal law enforcement agent engaged in the performance of the protective functions authorized by this section or by section 1752 of this title shall be fined not more than $1,000 or imprisoned not more than one year, or both."  Thus, in Congress's eyes, both culprits were equally culpable and should be treated alike.

By adopting this view, Congress seems to have reconceptualized § 1752 and created a different sort of federal crime.  Congress in 1970 may have conceived of § 1752 as duplicating state prohibitions to confer federal jurisdiction, much in the way the Supreme Court in Feola understood 18 U.S.C. § 111.  Congress in 2005 apparently did not share this understanding.[2]  It instead viewed § 1752 as precisely the type of offense that the majority in Feola went out of its way to distinguish: an *aggravated* offense leveling an added penalty against those who endanger Secret Service protectees.  Cast in this light, the argument that a defendant need not have any mens rea regarding the Secret Service protectee's presence because that element is "jurisdictional only" loses much of its shine.  When reworking the statute, Congress perceived a violator of

_____

[2] At least based on the passages quoted above from the House Report, which is the only source of legislative history the Court has located referencing the reason for the penalty increase.

§ 1752 as on par with the individual who "*knowingly* and willfully obstructs, resists, or interferes with a Federal law enforcement agent engaged in the performance of the protective functions." 18 U.S.C. § 3056(d) (emphasis added).  To violate the latter offense, one must know that the individual that he is obstructing, resisting, or interfering is a law enforcement officer performing his official duties.  That is what makes the conduct wrongful and deserving of up to one year imprisonment.  See Feola, 420 U.S. at 678–79 (noting that, even though no mens rea is specified, it would be appropriate to read in a knowledge requirement if § 111 were "seen primarily as an anti-obstruction statute").  It would thus seem that the same should be true of § 3056(d)'s analog offense, § 1752.  To warrant the enhanced penalty, the culprit must know that, in some sense, he is endangering the Secret Service and their protectees.  That extra layer of knowledge is what sets § 1752 violators apart and makes them worthy of the aggravated prohibition.  Sections 1752(c)(1)(A), (B), or (C) were, accordingly, no longer seen as "jurisdictional only."[3]

\*       \*       \*

The Court recognizes that this case does not shake out as cleanly as some that the Supreme Court has confronted in recent years.  Unlike the requirement that a defendant know he is using a means of identification "of another person" to be guilty of identity theft, see Flores-Figueroa, 556 U.S. at 647, or that the powder in his possession is "a controlled substance" to be guilty of a drug offense, see McFadden, 576 U.S. at 191–92, there are some contextual considerations here that militate against extending the knowledge requirement to the hilt.  At the

---

[3]  The Court appreciates that, to the extent this congressional re-conception of § 1752 as an aggravated offense allowed some wrongdoers who unwittingly trespass or cause havoc around a protectee to escape the provisions' ambit, Congress in 2005 may have partially erased the work that Congress in 1970 set out to achieve when creating a uniform federal offense.  If that is the case, Congress can pass a new statute.  But it is not the Court's role, nor would it be just, to plug the hole by labeling an element "jurisdictional only" when it is, in fact, the sole reason for the stiffer penalty.

same time, these factors are not as clear cut as they are in some cases in which courts have found reason to jettison the most natural reading of the statute, such as child-sex-crime cases. This case lands somewhere in the middle from this Court's vantage. Considering the statutory language in its broader context, the Court does not locate any background principle or purpose that overrides the statute's plain text applying the knowledge requirement to "restricted building or grounds"—a statutorily defined term that requires more than an area being restricted in a colloquial sense of the word. At most, the countervailing context brings matters closer to equipoise. And when an assessment of the sweep of a criminal law winds up in that posture after all the tools of statutory interpretation have been employed, any tie ought go to the defendant. See, e.g., Cleveland v. United States, 531 U.S. 12, 25 (2000) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." (citation omitted)).

Accordingly, to convict Groseclose of violating 18 U.S.C. §§ 1752(a)(1) and (a)(2), the government must prove beyond a reasonable doubt that Groseclose knew that (1) the Capitol building and its grounds were "posted, cordoned off, or otherwise restricted" on January 6 and (2) a "person protected by the Secret Service [was] or [would] be temporarily visiting" the Capitol that day.

**B.** **The Government Did Not Prove Groseclose Knew then-Vice President Pence Was in the Capitol on January 6**

The government did not meet its burden here. While the government proved beyond a reasonable doubt that Groseclose knew the Capitol building and grounds were "posted, cordoned off, or otherwise restricted" on January 6 and separately proved, as a factual matter, that then-Vice President Pence was inside the building on that day, it did not present sufficient evidence that Groseclose *knew* the Vice Present (or any other Secret Service protectee) was in the area.

The government presented plentiful proof that Groseclose knew that the Capitol was in some sense restricted and that he lacked lawful authority to enter it on January 6.  To recount just a few pieces of evidence: (1) Groseclose arrived at the Capitol wearing a gas mask; (2) he watched as fellow rioters used bike racks that had once secured the premises to scale the walls of the Lower West Terrace; (3) he then proceeded up the Northwest Stairs as the mob pushed past officers; (4) once up the stairs, he entered the Capitol building through a broken window; (5) at the time he entered the Capitol, Capitol Police Lieutenant George McCree and Officer Ricardo Vanzego testified that the building's alarms were sounding; and (6) undeterred, Groseclose journeyed through the building, obstructing officers who were attempting to close a security door and then traveling further into the Capitol Visitor's Center.  The government also sufficiently proved the second half of the "restricted building or grounds" act element with Secret Service Inspector Lanelle Hawa's undisputed testimony about Vice President Pence's movements on January 6, which was corroborated by Government Exhibit 707 showing the Vice President exiting the Capitol with his security team.

By contrast, the government presented almost no evidence that Groseclose *knew* that Vice President Pence was inside the Capitol that day.  The evidence regarding Groseclose's plans prior to January 6 does not establish that he knew Vice President Pence was to preside over the Joint Session to certify the Electoral College vote.  And on January 6 itself, the government did not prove that Groseclose heard any of President Trump's speech, let alone the sections referencing the Vice President.  There is also no evidence that Groseclose heard other rioters' threats to "hang Mike Pence" or any similar messages.  The only evidence the government offered on this score are two communications *after* January 6.  The first is a video Groseclose shared on social media calling Vice President Pence "corrupt" and a "traitor."  Gx. 523.  The

21

second is a series of text messages between Groseclose and his long-time partner in which she opines that he only cares about himself and Mike Pence.  Gx. 614.  That is not enough to prove beyond a reasonable doubt that Groseclose knew while he was at the Capitol that the Vice President was there that day as well.  It is entirely plausible based on the evidence presented that he learned of the Vice President's role in the certification in the aftermath of January 6 when the events of that day were widely discussed and publicized in the media.

This finding is in no way inconsistent with the Court's prior conclusion that Groseclose intentionally obstructed an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).  As the Court explained when rendering its partial verdict, Groseclose did not need to know all the intricacies of the certification process to intend to obstruct the proceedings related to the 2020 presidential election that were taking place on January 6.  He therefore did not need to know that Vice President Pence was presiding over the joint session of Congress to form the requisite mens rea for the § 1512(c)(2) offense.  But, as discussed above, that is not true for the §§ 1752(a)(1) and (a)(2) charges.  For this reason, the Court finds Mr. Groseclose not guilty of Counts Three and Four.

The Court directs the Clerk of Court to enter these verdicts.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date: January 5, 2024