**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-311-CRC** |
| **JEREMY GROSECLOSE** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jeremy Groseclose to 57 months of incarceration, 36 months of supervised release, $2,000 in restitution, a fine of at least $41,265, and the mandatory assessment of $220. The advisory Guidelines range is 46–57 months of custody; the government's recommendation of 57 months of custody is at the high end of that range.

## I.     INTRODUCTION

The defendant, Jeremy Groseclose, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

1

Groseclose joined the storming of the Capitol, waving the crowd of rioters on from the stairs leading up from the north scaffolding. He entered the Capitol building through a smashed window next to the Senate Wing Door. In the Crypt, Groseclose led the charge as a crowd of rioters advanced toward the Capitol Visitor's Center (CVC). While police tried to close the doors to cut off access to the CVC, Groseclose prevented the doors from closing, first by placing a trash can under the doors and then by whacking his hand against the bottom of the doors to trigger them to reopen. As the doors opened, Groseclose also grabbed a chair and attempted to throw it at an officer. Groseclose then pointed at an isolated officer, singling him out, as another rioter sprayed that officer with a chemical agent. As a result of the doors remaining open, the rioters gained access to the CVC, and Groseclose alerted the other rioters to this access point by walking back toward the mob and directed them into the area. In fact, as officers struggled with rioters in that area, Groseclose encouraged more of them to join the fray. In total, Groseclose remained in the Capitol building for about 40 minutes. After exiting the building, Groseclose remained on Capitol grounds, climbing on top of a law enforcement vehicle. After the January 6, 2021 riot, Groseclose bragged about his participation in the riot and called for further political violence, writing "We stormed the capital [sic] and took it." He called for politicians to be "[m]arch[ed] . . . out on a big ass platform and hang[ed] . . . on live TV."

The government recommends that the Court sentence Groseclose to 57 months of incarceration for his conviction of violating 18 U.S.C. § 231. A 57-month sentence reflects the

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

gravity of Groseclose's conduct, his failure to accept responsibility for his actions, and the need to deter the defendant and others from future criminal conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Complaint and Statement of Facts filed in this case, ECF No. 1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.     Groseclose's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-January 6 Social Media*

Groseclose was well aware of the Congressional certification proceeding—a fundamental step in the constitutional transfer of power—set to take place inside the Capitol on January 6, 2021. One of his Facebook connections shared with Groseclose an image of the Capitol with language describing an attack Congress, not a mere protest: "Occupy Congress," "If they won't hear us, they will fear us," "The great betrayal is over," "Election fraud is treason," and "January 6, 2021." Ex. 503 at 21. After receiving this image, Groseclose shared with multiple other Facebook users an image advertising a caravan of drivers to Washington, D.C., captioned "Jan 06 in support of President Trump and election integrity" with an image of the Capitol building in the background. *Id.* at 7, shown below.



*Image 1: Image shared by Groseclose on Facebook regarding plans for January 6, 2021 (Ex.
503 at 7)*

### *Approach to the Capitol*

On January 6, 2021, Groseclose traveled from a hotel in northern Virginia to the area of
the Ellipse in Washington, D.C., where then-President Trump and others were speaking about the
impending certification proceeding in Congress. Exs. 301, 601, 603. Groseclose listened to the
speeches and began walking toward the Capitol building at about 1:09 p.m. Ex. 605. Groseclose
arrived at the area of the Peace Monument and entered the restricted area of the Capitol at
approximately 1:42 p.m. Ex. 608. He brought with him, and at times wore, a gas mask; he also
carried a helmet and a metal pole with an American flag zip tied to it. Ex. 109 at 00:58.

4



*Image 2: Photo taken by Groseclose of rioters climbing on the Peace Monument (Ex. 608)*

Groseclose walked onto the northwest lawn and ascended the northwest stairs of the Capitol building toward the Upper West Terrace at approximately 2:18 p.m. Ex. 103. As he ascended the stairs, Groseclose encouraged other members of the crowd to move forward by gesturing with his arms. *Id.* At times, Groseclose turned back toward the crowd, triumphantly raising his flag in celebration of the riot. *Id.*



*Image 3: Groseclose raising an American flag (Ex. 103 at 02:17)*

**Breach of the Capitol Building and Groseclose's Entry into the Capitol**

At approximately 2:24 p.m., Groseclose broke into the Capitol through a broken window adjacent to the Senate Wing Door. Ex. 106. As he entered, wearing his gas mask, Groseclose heard alarms blaring overhead. 11/13/23 Trial Tr. at 51:20-52:5.



*Image 4: Groseclose enters the Capitol building (Ex. 106 at 01:13)*

After entering, Groseclose walked south, toward the Crypt. Along the way, Groseclose entered an interior office off a hallway leading to the Crypt. Ex. 148. After several minutes, Groseclose left the office and continued to the Crypt, arriving at approximately 2:28 p.m. Ex. 107.

### *Groseclose Impedes and Attempts To Assault U.S. Capitol Police*

At approximately 2:29 p.m., police officers retreated from the Crypt, down the steps and escalators leading to the CVC. Groseclose was standing in the Crypt at the time. He "crane[d] his neck and, upon realizing what was occurring, walk[ed] briskly toward the door with other rioters close behind him." 11/21/2023 Trial Tr. (hereinafter "Verdict") at 874:15-17. As Groseclose followed, he saw the officers closing security doors between the Crypt and the CVC. The officers were doing so in order to prevent rioters from accessing other parts of the Capitol where staff members were present and injured police officers were receiving medical care, as well as tunnels between the various buildings in the Capitol complex. 11/13/2023 Trial Tr. at 114:4-115:24. Groseclose took "calculated actions designed to prevent the officers" from keeping the rioters out of these areas. Verdict at 874:5-6. First, he helped another rioter place a trash can under the door. Then, he banged the underside of the door as it closed, causing it to open. Ex. 109.



*Image 5: Groseclose places a trashcan under the door (Ex. 109 at 00:46)*

During this clash, other rioters placed metal chairs under the retractable doors and slid those chairs toward officers in an apparent attempt to slow down their response. Ex. 109. One of these officers kicked at chairs to push them out of the way of the door and of the police; he kicked one of these chairs such that it slid under the door, across the floor, and toward Groseclose. Ex. 109 at 00:40-00:50. Groseclose "appeared to grab the chair with his right hand, pick it up, and thrust it back towards the officers." Verdict at 872:10-12. The Court observed that "the frame-by-frame images show Mr. Groseclose moving his body weight and hand forward as he pushes the chair back towards the officers." *Id.* at 872:17-20. As Officer Mencia explained in testimony, the chair was "launched forward," 11/14/2023 Trial Tr. at 301:5, then traveled to the right in the direction of another rioter. The Court found that Groseclose "was not the only person who threw the chair towards officers," Verdict at 872:13-14, and that another person had his hands on the chair last and may have been the driving force. "Nonetheless, the frame-by-frame images show Mr. Groseclose moving his body weight and hand forward as he pushes the chair back towards the officers." *Id.* at 872:17-20.

8



*Image 6: Groseclose reaching for the chair (circled in red) (Ex. 109 at 00:50)*

Groseclose's behavior immediately after throwing the chair demonstrates his intent to obstruct police and his willingness to assault them. As the door opened, Groseclose "pointed out to his fellow rioters an officer shown in Exhibit 149 attempting to block rioters from progressing through another door to Mr. Groseclose's left." Verdict at 873:11-14. And as Image 7, below, shows Groseclose pointed to this officer at the same time as one of his fellow officers targeted that officer with chemical spray. In other words, Groseclose "was on the front line of the rioters" and was "a central player in interfering with officers' failed attempts to secure the [CVC] and other areas deeper into the Capitol." *Id.* at 873:8-9, 873:15-18.



*Image 7: Groseclose pointing at an officer (Ex. 109 at 00:53)*

Groseclose moved to the CVC, depicted in Image 8, below, then returned to the area of the security door he had just helped to breach. There, he directed his fellow rioters toward the CVC. Ex. 115-A. As law enforcement witnesses testified, once inside the CVC, the rioters could have gotten access to the tunnels connecting the U.S. Capitol building to other congressional buildings where congressional staffers and injured officers were located. 11/13/2023 Trial Tr. at 114:4-115:24.

10



*Image 8: Groseclose encouraging rioters into the CVC (Ex. 116 at 00:12)*

While inside the CVC, Groseclose saw rioters fighting with police. Holding his cell phone to record video of these events, he joined a crowd encircling officers, forcing them to split their attention as they wrestled with violent members of the mob. Ex. 115-A. Again, here, he was no passive observer. Instead, when the fight began, he returned to the escalator in the center of the CVC (depicted in Image 8, above), and encouraged other rioters to swarm and surround police. *Id.*

At approximately 2:41 p.m., Groseclose left the CVC. He traveled to the Rotunda, where he remained until about 2:57 p.m. Exs. 120-125. Groseclose exited the Rotunda heading south, then walked into congressional office space of then-House Minority Leader Kevin McCarthy—Room H205—arriving at approximately 2:59 p.m. Ex. 127 at 00:06. Groseclose walked through the suite of offices until directed to leave by a U.S. Capitol Police officer. Exs. 129, 130. As he exited at approximately 3:03 p.m., Groseclose stole a tote bag from one of the offices, which he carried out of the building. Exs. 130, 131. The tote bag and its contents were never recovered.

Groseclose returned to the Rotunda briefly and then exited the building through the East Rotunda Doors at approximately 3:04 p.m. Ex. 133 at 00:29.

Though he had left the building, Groseclose did not leave the restricted area of the Capitol. Groseclose remained on the East Front of the Capitol for another hour and a half. Exs. 140-143. While on the East Front, Groseclose climbed on top of a law enforcement vehicle. Ex. 162.



*Image 9: Groseclose on top of law enforcement vehicle (Ex. 162).*

### *"We Stormed the Capital and Took It":*
### *Groseclose Celebrates After January 6, 2021*

Rather than feeling remorse for his participation in the riot, Groseclose celebrated his conduct. To one person, he wrote, "We stormed the capital [sic] and took it." Ex. 514 at 4. He also wrote, "It's been very violent and very f****** bloody and I ain't even kidding buy [sic] you don't even understand I can show you some videos that will blow your mind right now of me sitting in

the Capitol doing s*** that's got to be highly illegal I drink [sic] rum and smoked a blunt and [sic] Nancy [P]elosi's office." *Id.*

> **Author** Jeremy Groseclose (Facebook: 1271743112)
> **Sent** 2021-01-06 22:07:09 UTC
> **Body** We stormed the capital and took it

> **Author** Jeremy Groseclose (Facebook: 1271743112)
> **Sent** 2021-01-06 22:08:12 UTC
> **Body** Two people are dead I'm pretty sure yeah it's getting real real dude It's been violent and very f****** bloody and I ain't even kidding but you don't even understand I can show you some videos that will blow your mind right now of me sitting in the Capitol doing s*** that's got to be highly illegal I drink rum and smoked a blunt and Nancy pelosi's office

*Image 10: Selections from Groseclose's Facebook posts and messages (Ex. 514)*

After January 6, 2021, Groseclose called for additional political violence. In one message, sent on January 15, 2021, and anticipating further violence by a "Patriot Army," he wrote, "the hell with arresting [politicians] March them out on a big ass platform and hang them on live TV." Ex. 530 at 5. A few seconds later, he clarified, "They want to make a big deal about the [noose] some idiot through [sic] over that thing up there at the Capitol but the penalty for treason is hanging in case most people are too stupid to realize that." *Id.* at 6. The Court recognized that Groseclose's language was a reference to "the fact that someone had erected a gallows at the Capitol," Verdict at 881:24-25, and found that Groseclose's post was evidence of his intent to interfere with Congress's business. *Id.* at 881-882.

> **Author** Jeremy Groseclose (Facebook: 1271743112)
> **Sent** 2021-01-15 11:31:40 UTC
> **Body** If it really happens the hell with arresting them March them out on a big ass platform and hang them on live TV

**Author**
    Jeremy Groseclose (Facebook: 1271743112)
**Sent** 2021-01-15 11:32:03 UTC
**Body** They want to make a big deal about the new some idiot through
over that thing up there at the Capitol but the penalty for treason
is hanging in case most people are too stupid to realize that

*Image 11: Selection from Groseclose's Facebook posts (Ex. 530)*

**Groseclose's Intent to Obstruct Congress on January 6, 2021**

In considering the evidence at trial, the Court found that Groseclose "did obstruct and impede" the certification of the electoral college vote, and that his actions "directly contributed to the inability of Congress to conduct the certification proceeding as scheduled that day." Verdict at 876:14, 876:24-877:1. The Court found that Groseclose visited websites touting that January 6 was "the last chance to stop the transfer of power," *id.* at 878:5-6 and that "the defendant's actions before, during and after January 6th all reflect an intent to obstruct the proceedings in Congress on that day." *Id.* at 877:17-22. The Court "searched the evidence for other plausible explanations for [Groseclose's conduct] in the Capitol that day, and … found none." *Id.* at 880:12-14. And, critically, Groseclose's conduct, "[b]reaching police lines and dispersing throughout the facility," prevented Congress from certifying the election. *Id.* at 880:2-3.[2]

## III.   THE CHARGES AND PROCEDURAL HISTORY

On December 1, 2021 a federal grand jury returned a Superseding Indictment charging Groseclose with six counts, including, 18 U.S.C. § 231(a)(3) (civil disorder), 18 U.S.C.

---

[2] The Court granted the government's motion to dismiss Count Two, and the defendant, in his objections to the Presentence Report, has objected to paragraphs that deal with the defendant's efforts to obstruct the certification of the electoral college vote. It appears that, in the defendant's mind, his intent to obstruct this important proceeding does not matter after the Supreme Court limited the reach of 18 U.S.C. § 1512 in *Fischer v. United States*, 144 S. Ct. 2176 (2024). Not so: the defendant's intent remains relevant to assessing the various factors set forth in 18 U.S.C. 3553(a), which are critical at sentencing.

§ 1512(c)(2) and 2 (obstruction of an official proceeding), and 40 U.S.C. §§ 504(e)(2)(D) and (G). ECF No. 25. On November 21, 2023, Groseclose was convicted of those offenses following a bench trial. On January 5, 2024, Groseclose was acquitted of two other charges. On August 2, 2024, the government moved to dismiss the count brought under 18 U.S.C. § 1512(c)(2) and 2 (obstruction of an official proceeding) in light of the Supreme Court's decision in *United States v. Fischer*, 114 S. Ct. 2176, 2181 (2024). On August 5, 2024, this Court granted the motion and dismissed Count Two with prejudice.

### IV.    STATUTORY PENALTIES

Groseclose now faces sentencing on 18 U.S.C. § 231(a)(3) (civil disorder), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).

As noted by the Draft Presentence Report ("PSR") issued by the U.S. Probation Office, Groseclose faces up to five years of imprisonment under 18 U.S.C. § 231(a)(3), and up to 6 months of imprisonment under 40 U.S.C. §§ 5104(e)(2)(D) and (G), Presentence Report ("PSR") (ECF 105) at 2-3, in addition to restitution and a mandatory special assessment of $120.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). On March 7, 2024, the Court instructed the Probation Office to file a supplement to the draft Presentencing Investigation Report "calculating the Defendant's guidelines range in the absence of his Section 1512 conviction." Minute Order (Mar. 7, 2024).

The government agrees with the Guidelines analysis set forth in the supplemental PSR:

<u>Count One: 18 U.S.C. § 231</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(C)[4] | Dangerous Weapon Possessed | +3 |
| U.S.S.G. § 3A1.2(b)[5] | Official Victim | +6 |
| | **Total** | **23** |

**Total Offense Level:**                                                                    **23**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. For several reasons, the

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. This cross reference is appropriate here because Groseclose attempted to throw a chair at officers as the officers attempted to close the doors to the CVC. Verdict at 872:7-20; PSR ¶¶ 23, 42 n.3.

Groseclose objects to the use of 2A2.2(a), noting that its application is not supported by the government's charging decisions. But that is not what the Guidelines direct. As noted above, § 2A2.4(c)(1) directs that 2A2.2 should be used if the *conduct* constituted aggravated assault. *Cf.* § 1B1.2 cmt. 1 (noting that, in a case resolved by plea agreement, a factual statement that establishes a more serious offense than the offense of conviction should trigger the application of the guideline section applicable to the more serious offense). As noted by the PSR writer here, the conduct supports the application of the aggravated assault guideline, and Groseclose's objection is not well taken. PSR at 34.

[4] The enhancement in U.S.S.G. § 2A2.2(b)(2)(C) is appropriate where "a dangerous weapon (including a firearm) was brandished or its use was threatened." Groseclose brandished and threatened use of a dangerous weapon, here a chair, when he used the chair in a manner capable of causing serious bodily injury by throwing the chair at the officer.

[5] The enhancement in U.S.S.G. § 3A1.2(b) is appropriate because the victim was a government employee, specifically a member of the United States Capitol Police, and Groseclose's attack on the officer was motivated by the officer's status as a government employee who was responding to the riot at the Capitol and who, in the course of his duties, was attempting to prevent Groseclose and other rioters from gaining access to sensitive parts of the Capitol building.

government agrees with Probation that the defendant is not eligible for an adjustment pursuant to § 4C1.1.

First, Groseclose personally used violence and made credible threats of violence. Violence has been defined as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm," as well as the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5; see also *United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (adopting the definition of violence from *Bauer*). A credible threat of force was defined as "a believable expression of an intention to use physical force to inflict harm." *Bauer*, No. 21-cr-386-2, ECF No. 195 at 6.

When examining whether the defendant's conduct posed a credible threat of violence, a court must consider the totality of the circumstances surrounding that conduct:

> In evaluating whether credible threats of violence were posed by the defendant's offense conduct, to my mind, the context matters very critically. In other words, evaluating a defendant's offense conduct requires examination of all the factors of the offense including what the particular defendant being sentenced did; where he was; what he was seeing; what a person would reasonably understand was the volatility of the situation; the threat that whole situation would pose to others; the foreseeable harm of the situation; and the consequences of the specific defendant's individualized actions. So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.

*United States v. Andrulonis*, No. 23-cr-085 (BAH), Sent. Hr'g. Tr. at 11-12.

Here, Groseclose engaged in physical use of force when he picked up a chair and attempted to throw it at a police officer. This use of physical force, although not successful, showed Groseclose's vehemence and exertion with the intention of injuring the officers who were attempting to block his and other rioters' path to the CVC.

Second, Groseclose also made a credible threat of violence when he singled out a police officer by pointing at him as the mob advanced through the doors to the CVC, while another rioter deployed pepper spray. Groseclose made that threatening gesture in the middle of the most violent attack on the United States Capitol in recent history, while surrounded by other rioters that had followed Groseclose's charge into the space, after having personally taken steps to prevent the police from being able to close specific doors to block the rioters' movements through the building. At around the same time that Groseclose pointed at this officer, another rioter threw a chair at his head. Ex. 149 at 00:05-00:12. And after Groseclose singled out the officer, Groseclose followed the officers down the escalators, again leading a mob of rioters, and repeatedly tried to encourage other rioters to come down the escalators to join the fight with the police in the CVC. Taken in light of the totality of the circumstances, Groseclose's conduct would have been seen as "a believable expression of an intention to use physical force to inflict harm." *Bauer*, No. 21-cr-386-2, ECF No. 195 at 6.

Third, Groseclose possessed a dangerous weapon during the events at issue. While in the area between the Crypt and the escalators to the CVC, Groseclose picked up a chair and attempted to throw the chair at an officer. A chair is also "an instrument capable of inflicting death or serious bodily harm," when used in the manner in which Groseclose attempted to use it.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 57. Accordingly, based on the government's calculation of the defendant's

total offense level, at 23, Groseclose's Guidelines imprisonment range is 46 to 57 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Groseclose's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Groseclose led the charge toward a security door between the Crypt and the CVC at the helm of a crowd of rioters. To prevent rioters from advancing toward the CVC—which led to other parts of the building where staff members were present and injured police officers were receiving medical care—U.S. Capitol Police began closing security doors between the Crypt and CVC. Groseclose worked to prevent the doors from closing. He helped another rioter place a trash can under the door. He also banged the underside of the door as it closed, to force it back up. He then singled out an officer, directing other rioters' attention to the officer, subjecting that officer to attacks. Groseclose himself attempted to throw a chair at the officer.

Groseclose's actions were particularly bad because by forcing open that door, he made the riot worse: he allowed people into sensitive spaces, he made it harder for police to clear the Capitol, and dialed up the pressure on officers during a time when rioters were assaulting them. In fact, without that breach of the door, the assaults in the CVC never would have happened, and officers

would not have had to worry about the safety of staffers and Congressmembers who were hiding throughout the Capitol building.

Moreover, nothing in this defendant's Guidelines calculation reflects the fact that Groseclose joined a mob that targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law; Groseclose would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power. Accordingly, a sentence at the high end of the advisory guideline range is appropriate.

### B.  The History and Characteristics of the Defendant

The defendant's crimes on January 6 and his statements since show lack of remorse and disregard for the legal system. He has failed to take any responsibility for his actions, and, in fact has given an interview on social media in which he is described as a "political prisoner," claimed he was only at the U.S. Capitol to "record" and take pictures, and accused the government of "destroy[ing]" his house. *See* Groseclose Jan. 7, 2024 Interview with Patriot Freedom Project, *available at* https://x.com/JeremyGroseclos/status/1744482414062145824 (last accessed 9/25/2024).

To the extent that Groseclose argues that this Court should take his family into account when applying mitigating factors, family ties and responsibilities are "not ordinarily relevant" in determining a sentence, and departures are permitted only "when family circumstances are 'extraordinary.'" *United States v. Dyce*, 9 F.3d 1462, 1466 (D.C. Cir. 1996). There is nothing extraordinary about the circumstances here—a couple with two children will ordinarily be faced

with hardship when one parent is unable to work or provide childcare for any number of reasons, including being sentenced to a term of incarceration.

Even if family ties and responsibilities were relevant, Groseclose knew of his duty and the potential consequences of his actions to his family when he went to the riot on January 6, 2021. Groseclose callously disregarded his family when he left his heavily pregnant partner and their young child alone in a hotel room while he went to the U.S. Capitol to participate in the riot. As his partner put it at the time, Groseclose did not care about his family, "just you . . . and mike pence," and, presumably referring to the tote bag Groseclose stole from the Capitol, expressed frustration that Groseclose kept "federal stolen property. . . in your house . . . and all you can do is brag." Ex. 614 at 21-22, 23-24.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Groseclose's criminal conduct on January 6 was the epitome of disrespect for the law.

> We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.

*United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Groseclose has not expressed any remorse or contrition; in fact, his social media statements after January 6 were those of a man bragging about what he had done. Groseclose's own statements that "We stormed the capital [sic] and took it," and on January 15, 2021, called for more political violence: "the hell with arresting them March them out on a big ass platform and hang them on live TV." These statements demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his violent rhetoric. He has also continued to speak about January 6, depicting himself as a victim, and showing a lack of remorse. For example, on January 7, 2024, Groseclose gave an interview about January 6, 2021 with the "Patriot Freedom Project." He has also re-posted multiple conspiracy theories and disinformation about January 6, including during the run-up to his trial dates in 2023, and shared and commented on other posts treating the January 6 rioters as victims.

Groseclose's decision to join the mob on January 6, 2021 was a choice, one that the Court found that he made intentionally and for a specific goal. Since that goal failed, and the riot has been appropriately treated for what it is—a mass crime of historic proportions—Groseclose's response has been to falsely blame others for setting him up and to insist that he did nothing wrong.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

This should concern the Court greatly, as it shows that he presents a danger of recidivism. In particular, it reflects a likely willingness to engage in political violence again, especially in the event of an election result that Groseclose does not like and chooses not to accept. A significant sentence of incarceration is needed to deter Groseclose and protect the community.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious,

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Recently, in *United States v. Thomas Roberston*, this Court sentenced the defendant for his conviction on 18 U.S.C. § 231(a)(3), after the dismissal of a conviction on 18 U.S.C. § 1512(c)(2). There, as here, the defendant carried a stick into the U.S. Capitol building but, like Groseclose, did not use it. Like Groseclose, the defendant in *Robertson* made threatening post-January 6 statements. While the defendant in *Robertson* publicly advocated for violence against law enforcement officers, which Groseclose did not do, that difference is taken into account in the lower recommendation. The Court sentenced Robertson to 72 months, and in doing so, varied upward to account for the fact that the sentencing guidelines range for § 231(a)(3) (37-46 months) did not adequately capture the degree to which Robertson's goal was to interfere with the peaceful transition of power.

In *United States v. Anthony Sargent*, the defendant's sentence was driven, like here, by a felony charge of 18 U.S.C. § 231(a)(3). There, as here, the defendant prevented officers from

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

retreating to safety and threw heavy objects at the officers. Additionally, both Groseclose and Sargent encouraged other rioters to charge at the police. Like Sargent, who called for violence at the Capitol leading up to January 6, Groseclose shared multiple Facebook images calling on people to go to Washington, D.C., and then after January 6 stated, "the hell with arresting them March them out on a big ass platform and hang them on live TV." But unlike Groseclose, Sargent did not possess a dangerous weapon during the riot. Judge Moss upwardly varied from an advisory range of 41 to 51 months, and sentenced Sargent to 60 months of incarceration.

In *United States v. Sparks*, Judge Kelly of this district sentenced the defendant to 53 months on a felony charge of 18 U.S.C. § 231(a)(3). There, as here, the defendant entered the Capitol building through the broken Senate Wing window, was a ringleader during the January 6, 2021 riot, and led the charge into the Capitol, similar to how Groseclose waved rioters up the north scaffolding stairs and, later, into the CVC. There, the defendant led the mob close to where Congressmembers and their staff were located and therefore at risk. As noted above, Groseclose did the same by leading and directing rioters into the CVC, and sending the rioters closer to the tunnel system where congressional staff and injured law enforcement officers were taking shelter. In *Sparks*, Judge Kelly varied upward from a Guidelines range of 15-21 months to give a 53-month sentence.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Groseclose was convicted of a violation of an offense under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of

loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

More specifically, the Court should require Groseclose to pay $2,000 in restitution for his convictions on Counts 1, 5, and 6. This amount fairly reflects Groseclose's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Groseclose's conviction under Section 231 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, Groseclose has raised over $40,000 ($41,515 as of the date of this filing) in an online campaign styled as "Jeremy's J6 Survival Fund." PSR ¶ 108a. The website indicates the funds are to be used for traveling to Washington, D.C., hotel expenses, travel, and childcare. *Id.* While the website was set up by Groseclose's partner, Lauren Dean, the title of the fundraiser ("Jeremy's J6 Survival Fund") and the statement that the fund was "put together for my husband Jeremy Groseclose and our family" makes clear that Groseclose is the main focus of the website; as the government's evidence shows, the money was Groseclose's,

and the website was set up by Ms. Dean for the specific purpose of interfering with the government's effort to collect it as a fine after Groseclose's conviction. *See* ECF No. 93. At the time that the fundraiser was set up, the fundraiser description specifically stated that, "The ultimate goal would be for us to raise enough money to get proper representation." *Id.* at 2, citing ECF No. 72 at 6. After the fundraiser was set up, an X (former Twitter) user stated that "[Groseclose's] wife is setting one up, he was advised not to put his name on it because the courts are confiscating their funds" before that user shared the link to the fundraiser. ECF No. 93 at 3-4. Context makes clear that the defendant was aware that following his conviction, the Court would try to reclaim these funds, so he and his partner set the fundraiser up in his partner's name to avoid a fine. Groseclose should not be able to "capitalize" on his participation in the Capitol breach in this way.

On November 21, 2023, this Court ordered that "the defendant not spend or dispose of or dissipate in any way the funds that are in that account now because those funds may be subject to a fine upon sentencing." Verdict at 894:15-19. Groseclose moved to vacate that order. ECF 91. The government opposed, noting that Ms. Dean set up the fund for Groseclose on the same day that he decided to hire new counsel. ECF 93 at 3. To the extent Groseclose claims these funds are being used pay his legal fees (or have already been used to pay legal fees), the government requests an accounting.

IX.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of 57 months, 36 months of supervised release, $2,000 in restitution, a fine of at least

$41,515, and the mandatory assessment of $120.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Carolyn J. Jackson*
         Carolyn J. Jackson
         Assistant United States Attorney
         D.C. Bar No. 1644971
         601 D Street N.W.
         Washington D.C. 20579
         carolyn.jackson@usdoj.gov
         (202) 252-7078

         Michael J. Romano
         IL Bar No. 6293658
         Deputy Chief, Capitol Siege Section
         601 D Street N.W.
         Washington D.C. 20579
         Michael.romano@usdoj.gov

         Anthony W. Mariano
         MA Bar No. 688559
         Trial Attorney / Detailee
         Capitol Siege Section
         Anthony.mariano@usdoj.gov
         (202) 476-0319